## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

| | | |
|---|---|---|
| THE DOUGLAS STEWART COMPANY, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. CV420-101 |
| HIQO SOLUTIONS, INC., | ) ) | |
| Defendant. | ) ) ) | |

### O R D E R

Before the Court are Plaintiff The Douglas Stewart Company, Inc.'s ("DSC") Motion for Partial Summary Judgment (Doc. 76), and Defendant HiQo Solutions, Inc.'s ("HiQo") Motion for Summary Judgment (Doc. 75). Also before the Court is HiQo's Motion to Exclude or Strike Plaintiff's Liability and Damages Expert. (Doc. 82.) The parties' respective motions are opposed. (Docs. 86, 90, 92.) For the following reasons, HiQo's motion for summary judgment (Doc. 75) is **GRANTED**, and DSC's motion for partial summary judgment (Doc. 76) is **DENIED**. Additionally, HiQo's motion to exclude (Doc. 82) is **DENIED AS MOOT**.

**BACKGROUND[1]**

I.   <u>INTRODUCTION</u>

At the core of this case is a dispute about the scope of a contract HiQo entered to provide certain technology services to DSC and whether HiQo breached that contract. DSC markets itself as a distributor and business service provider that specializes in servicing education-focused and collegiate retailers throughout the United States and Canada.[2] (Doc. 78 at ¶ 1; Doc. 93 at ¶ 1.) In 2016, DSC decided to update its website with the aim of improving the website's functionality and available features. (Doc. 78 at ¶ 5; Doc. 93 at ¶ 5.) Magento is an open-source e-commerce platform that DSC utilizes on its website.[3]

---

[1] The relevant facts are taken principally from the parties' respective statements of undisputed material facts (Doc. 75, Attach. 2; Doc. 78), and the responses thereto (Doc. 89; Doc. 93). Pursuant to Federal Rule of Civil Procedure 56(e) and Southern District of Georgia Local Rule 56.1, all material facts not controverted by specific citation to the record are deemed admitted, unless otherwise inappropriate. Where the parties offer conflicting accounts of the events in question, this Court draws all inferences and reviews all evidence in the light most favorable to the nonmoving party. See <u>Hamilton v. Southland Christian Sch., Inc.</u>, 680 F.3d 1316, 1318 (11th Cir. 2012) (citing <u>Moton v. Cowart</u>, 631 F.3d 1337, 1341 (11th Cir. 2011)).

[2] See <u>About The Douglas Stewart Company</u>, The Douglas Stewart Company, https://www.dstewart.com/about-douglas-stewart (last visited on August 23, 2022).

[3] Computer software company Adobe acquired Magento Commerce in 2018, and the e-commerce platform is now known as Adobe Commerce. <u>Adobe to Acquire Magento Commerce</u>, Adobe (May 21, 2018, 3:05 PM) https://news.adobe.com/news/news-details/2018/Adobe-to-Acquire-Magento-Commerce/default.aspx; <u>Adobe Commerce</u>, Adobe, https://business.adobe.com/products/magento/magentocommerce.html (last visited on August 23, 2022).

(Doc. 78 at ¶ 6; Doc. 93 at ¶ 6.) DSC's desired update included migrating the website from Magento 1 to Magento 2. (Doc. 78 at ¶ 6; Doc. 93 at ¶ 6.)

DSC engaged two third party companies—FarWell and Swarming Technology—to identify deficiencies in its former website. (Doc. 78 at ¶ 7; Doc. 93 at ¶ 7.) As part of this engagement, Swarming created a proposal for improving the performance, search capabilities, and design of DSC's website (the "Swarming Proposal"). (Doc. 78 at ¶ 8; Doc. 93 at ¶ 8.) DSC provided the Swarming Proposal to three software development service providers—Swarming, Acumium, and HiQo.[4] (Doc. 78 at ¶ 9; Doc. 93 at ¶ 9.) DSC contends that it asked each company to quote a project that would upgrade DSC's website in accordance with the proposal; however, HiQo disputes that it ever intended to quote a project that met all the specifications set forth in the Swarming Proposal. (Doc. 78 at ¶ 10; Doc. 93 at ¶ 10.)

## II.   THE MASTER SERVICES AGREEMENT

In late November 2016, DSC and HiQo entered into a contract they refer to as the Master Services Agreement (the "MSA"). (Doc. 78 at ¶ 14; Doc. 93 at ¶ 14.) The MSA is a standard form contract that HiQo routinely uses with clients. (Doc. 75,

---

[4] HiQo is a Georgia corporation that is in the business of providing information technology ("IT") outsourcing and offshore development services. (Doc. 75, Attach. 2 at ¶¶ 1-2; Doc. 89 at ¶¶ 1-2.)

Attach. 2 at ¶ 4; Doc. 89 at ¶ 4.) Pursuant to the MSA, HiQo agreed to provide "software and other development services for and on behalf of [DSC] as more particularly described in any Task Order or as otherwise agreed to by the Parties as evidenced or confirmed in writing." (Doc. 79, Attach. 6 at 3.) HiQo also agreed that all "Deliverables [would] be developed and delivered to [DSC] or its Clients in accordance and compliance with the Specifications, industry standards and all applicable laws, rules and regulations." (Id. at 5.) The MSA defined "Deliverables" as "the documents, code, Content, Software, websites and other materials and/or products to be developed or produced by HiQo for and on behalf of [DSC] . . . under and pursuant to this Agreement[.]" (Id. at 2.) The MSA also warranted that "the Deliverables [would] conform to the Specifications; and, [] all services provided by HiQo under and pursuant to [the MSA would] be performed and provided in a manner consistent with industry standards for the type of Services provided[.]" (Id. at 9.) The MSA defined "Specifications" as "the requirements for the design and development of the Deliverables hereunder, including, operational and functional capabilities and performance requirements as set forth in an applicable Task Order pursuant to [the MSA]." (Id. at 2.)

Under the MSA, DSC could contract for HiQo's services through one of four project models. (Id. at 4-5.) During their business relationship, the parties utilized the Project T&M and Team T&M models. (Doc. 75, Attach. 2 at ¶ 32; Doc. 89 at ¶ 32.) In relevant part, the Project T&M model is described in the MSA as follows:

> HiQo will provide software development services under a Task Order where the project scope is fixed. HiQo will staff such project at HiQo's discretion and HiQo is under no obligation to maintain the initial team structure. A Task Order is required for each project and such Task Order must contain at least a period of performance and the hourly rates for each role. Team members will only work on tasks entered in Jira.[5] All hours worked are billable subject to acceptance of a [DSC] project manager. HiQo will submit a weekly report of hours spent, any of which can be disapproved by [DSC] within five (5) business days. Any hours not disapproved with this five-day period will be deemed approved.

(Doc. 79, Attach. 6 at 4.) The Team T&M model is also outlined in the MSA:

> HiQo will provide software development resources (staff) under a Task Order where the resources are fixed. [DSC] can book resources for any period of time between 14 days and one year, where the resource utilization needs to be at either 50% or 100% for all roles for the period of the engagement . . . A Task Order is required for each team and such Task Order must contain at least a list of resources along with their booked period of performance and utilization . . . . Resources under such a TTM contract work managed in their tasking by [DSC] and HiQo shall not be responsible for the tasking of such resources . . . .

---

[5] Jira is HiQo's electronic "Task Management System." (Doc. 79, Attach. 6 at 3.)

(Id.)

When finalizing the MSA, HiQo agreed to modify a provision
in the contract allowing payments to be made in U.S. Dollars but
did not agree to modification of a provision governing the venue
for any legal dispute stemming from the contract. (Doc. 75,
Attach. 2 at ¶¶ 10, 11; Doc. 89 at ¶¶ 10,11.) DSC did not object
to or request modification of Section 7 of the MSA, entitled
"Discretion in Performing Work and Target Dates," which states

> HiQo shall have the right to determine the method,
> details, location, time and means of performing the
> work agreed to hereunder. [DSC] acknowledges and
> agrees that delays in developing software may occur,
> and that although HiQo will take all reasonable steps
> to mitigate and minimize any such delays, HiQo shall
> not be penalized or held accountable for failure to
> meet such target dates unless otherwise stipulated in
> a Task Order.

(Doc. 75, Attach. 2 at ¶ 12; Doc. 89 at ¶ 12; Doc. 79, Attach. 6
at 8.) The parties agree that no Task Order was ever signed by
the parties that identified an agreed-upon or stipulated target
date. (Doc. 75, Attach. 2 at ¶ 20; Doc. 89 at ¶ 20.) DSC also
did not object to or request modification of Section 8 of the
MSA, entitled "Acceptance and Corrections of Defects in
Deliverables." (Doc. 75, Attach. 2 at ¶ 14; Doc. 89 at ¶ 14;
Doc. 79, Attach. 6 at 8.) In relevant part, Section 8 states
that "HiQo will perform testing and debugging of the
Deliverables prior to their delivery to [DSC] and [DSC]

understands that despite thorough testing bugs may occur." (Doc. 79, Attach. 6 at 8.)

Section 23 of the MSA, "Entire Agreement: No Waiver" sets forth the following:

> This agreement, any Task Order signed pursuant to this Agreement, Exhibits or attachments thereto, constitute the entire agreement between the Parties concerning the subject matter hereof, superseding all prior negotiations and discussions. No waiver, amendment or modification of any provision of this Agreement or any Task Order shall be effective unless in writing and signed by both Parties.

(Doc. 79, Attach. 6 at 13.) The parties agree that no amendment or modification of the MSA was ever "in writing and signed by both parties." (Doc. 75, Attach. 2 at ¶ 30; Doc. 89 at ¶ 30.) The parties entered into and signed the MSA sometime around November 28, 2016. (Doc. 75, Attach. 2 at ¶¶ 15-17; Doc. 89 at ¶¶ 15-17; Doc. 79, Attach. 6 at 13.)

III. HIQO'S PROJECT APPROACH SUGGESTION

On December 8, 2016, HiQo provided DSC with a document entitled, "Douglas Stewart Magento Migration Project Approach Suggestion" (the "Project Approach Suggestion") that detailed a proposed plan to complete DSC's desired Magento migration project. (Doc. 79, Attach. 4 at 2, 5.) The Project Approach Suggestion included the following language under the heading "Estimation Approach":

> Given the project size and scope, it is not feasible to give a precise estimation for each and every

> feature/improvement requested by the client. Any attempt at producing a 'total estimation for the whole project' will come down to merely a guess.
>
> During the limited time spent on the initial investigation of the project, HiQo has identified the features for which it is possible to make a rough estimation. This estimation must not be considered a fixed-[price] bid, but should be used to get an idea of efforts/costs involved in implementing such a project.

(Id. at 6.) Below this section, the Project Approach Suggestion included a list of features for which HiQo provided estimations of an "assumed implementation approach." (Id. at 6-9.) The Project Approach Suggestion also included a list of features for which HiQo did not provide an estimate. (Id. at 9-10.) Preceding this list, under the heading "Not estimated features (out of scope)," the document included the following language:

> The features below cannot be estimated at this point due to either the vague/incomplete requirements or the fact that HiQo did not have access to all the necessary assets (e.g. some parts of the source code) at the time of the estimation. They will be referred to as 'out of scope' below, but this does not imply that they cannot be implemented, but only that they are not possible to estimate at the current time.

(Id. at 9.)

At this point, the parties' disputes emerge. DSC contends that the Project Approach Suggestion incorporated the Swarming Proposal in its entirety. (Doc. 78 at ¶ 11.) Additionally, DSC contends that the Swarming Proposal was incorporated into the MSA as part of its Specifications because the Swarming Proposal

was "evidenced or confirmed in writing" in the Project Approach Suggestion. (Doc. 78 at ¶ 16.) HiQo avers that its Project Approach Suggestion "merely referenc[ed] the Swarming Proposal" and that HiQo "only reviewed [the Swarming Proposal]" to develop a plan for how HiQo would approach the project, but did not intend for the Swarming Proposal to govern the project's actual implementation. (Doc. 93 at ¶¶ 10-11; Doc. 94, Attach. 1 at 12.) It is undisputed that when developing its proposal, HiQo understood that DSC desired a new website with improved performance, including an updated search engine, a site that could perform online checkouts, and a site that implemented SKU linking, although HiQo disputes ever promising to provide DSC with a fully functional website. (Doc. 78 at ¶ 12; Doc. 93 at ¶ 12.)

IV.  TASK ORDERS AND DSC INVOLVEMENT IN THE WEBSITE PROJECT

Pursuant to the MSA, HiQo began work on DSC's website in late 2016. (Doc. 78 at ¶ 27; Doc. 93 at ¶ 27.) In total, HiQo submitted nineteen Task Orders to DSC, two of which were Project T&M Task Orders and seventeen of which were Team T&M Task Orders. (Doc. 75, Attach. 2 at ¶ 45; Doc. 89 at ¶ 45; Doc. 75, Attach. 10 at 1-20.) HiQo submitted its first Task Order to DSC on December 8, 2016. (Doc. 75, Attach. 2 at ¶ 46; Doc. 89 at ¶ 46.) The December 8, 2016, Task Order states:

> HiQo Solutions will provide software development services as defined in Section 2.1a of the MSA. The customer will task HiQo by entering tasks into Jira. All hours will be logged and are subject to approval by the customer. HiQo will present all hours once a week for approval. If the customer does not disapprove any of the hours within five business days[,] they shall be deemed approved.

(Doc. 75, Attach. 10 at 20.) The remaining Task Orders included a brief "Descriptive Title" and outlined the HiQo employees that were being "booked" for a set amount of time but contained no further details about exactly what services HiQo would provide. (See, e.g., Doc. 75, Attach. 10 at 10 (using descriptive title "Douglas Stewart ESD Fulfilment Extension").) Representatives for each party signed all of the Task Orders. (Doc. 75, Attach. 2 at ¶ 47; Doc. 89 at ¶ 47.) Both parties signed HiQo's last Task Order on August 23, 2017. (Doc. 75, Attach. 2 at ¶ 49; Doc. 89 at ¶ 49.)

HiQo also contends that it received directions from DSC on certain tasks DSC wished HiQo to perform while working on the website. (Doc. 75, Attach. 2 at ¶ 52.) Angela Bluhm, DSC's current director of marketing, admitted that two other DSC employees had instructed HiQo on what tasks to complete by entering Swarming Technology specifications into Jira. (Doc. 75, Attach. 7 at 3, 8.) DSC contends that these instructions were simply high-level expectations for its website and that DSC

never instructed HiQo on how to implement its work. (Doc. 89 at
¶ 52.)

DSC employees had at least some concurrent ability to
contribute code to the website project. (Doc. 75, Attach. 6 at
12-14.) On at least one instance, a DSC employee was responsible
for causing disruptions to the website project. On May 8, 2018,
Sef van Kan, a DSC employee, emailed the following to Ivan
Korobuschenko, HiQo's main developer: "I'm terribly sorry for
breaking your site yesterday. I didn't mean to take code out of
default_head_blocks.xml." (Doc. 75, Attach. 17 at 9; Doc. 93 at
¶ 45.) However, Nathan Schultz, who at some point was DSC's
director of IT,[6] testified that any changes Sef van Kan made
"should have been easily detected and rolled back." (Doc. 91,
Attach. 10 at 17.)

---

[6] The Court notes that it found no description of Mr. Schultz's
job title or the dates of his employment in the parties' briefs
or the portions of Mr. Schultz's deposition provided to the
Court. The Court only found an explanation of Mr. Shultz's role
for DSC when reviewing a portion of Ms. Bluhm's deposition
testimony, another one of DSC's employees whose job title and
role is not described in the parties' briefs. (Doc. 79, Attach.
1 at 10.) This is one of many examples in the parties' briefs
and statements of material facts where both parties have failed
to provide adequate background information about the individuals
and events involved in this case. Although the Court has made
its best effort to uncover the facts relevant to the parties'
motions, ultimately the burden is on the parties to guide the
Court towards the facts that should be considered, not the other
way around. Chavez v. Sec'y Fla. Dep't of Corr., 647 F.3d 1057,
1061 (11th Cir. 2011) (explaining that "district court judges
are not required to ferret out delectable facts buried in a
massive record").

HiQo regularly submitted invoices to DSC for its services on the website project. (Doc. 75, Attach. 2 at ¶ 57; Doc. 89 at ¶ 57.) Between January 3, 2017, and August 2018, HiQo sent several invoices to DSC. (Doc. 75, Attach. 2 at ¶ 59; Doc. 89 at ¶ 59.) DSC approved and paid all but the final three invoices, which HiQo submitted between June 2018 and August 2018. (Doc. 75, Attach. 2 at ¶¶ 60-61; Doc. 89 at ¶¶ 60-61.)

V.    PERFORMANCE OF THE MSA AND WEBSITE LAUNCH FAILURE

DSC claims that the parties originally contemplated that the project would take approximately six months to complete, and that the updated website was expected to launch in June 2017. (Doc. 78 at ¶ 28.) Mr. Schultz testified during his deposition that he anticipated the project to last six months. (Doc. 79, Attach. 2 at 20; Doc. 79, Attach. 1 at 10.) Another one of DSC's employees, Ms. Bloom, testified that "HiQo's original estimate was that, per the Swarming discovery document, our Web site requests would take an approximate six-month time frame." (Doc. 79, Attach. 1 at 18-19.) HiQo avers that there is no signed agreement memorializing any specific target date for the project. (Doc. 93 at ¶ 28.)

Regardless, it is undisputed that HiQo's work on DSC's website was not near completion in June 2017. (Doc. 78 at ¶ 29; Doc. 93 at ¶ 29.) Then, from approximately September 2017 to January 2018, HiQo was not contracted to provide services for

DSC on the website project.[7] (Doc. 75, Attach. 2 at ¶ 53; Doc. 89 at ¶ 53.) DSC re-engaged HiQo's services in January 2018. (Doc. 75, Attach. 2 at ¶ 54; Doc. 89 at ¶ 54.) HiQo's work on the DSC website continued until July 31, 2018, when DSC terminated HiQo and revoked its access.[8] (Doc. 75, Attach. 2 at ¶ 55; Doc. 89 at ¶ 55.)

In June 2018, while still contracting with HiQo, DSC believed that it was ready to launch the new version of its website. (Doc. 78 at ¶ 30.) DSC contends that it made this decision based on information HiQo provided it. (Id.) Ms. Bluhm testified that there were a number of issues with the website's functionalities leading up to the website launch, but they "appeared to have been resolved" by Mr. Korobuschenko. (Doc. 79, Attach. 1 at 14; Doc. 93 at ¶ 45.) Ms. Bluhm further testified that DSC's main criteria for the website "were met on [its] staged environment in testing," and that this informed its decision to go live. (Doc. 79, Attach. 1 at 17.) Ms. Bluhm conceded that DSC was aware there would be bugs and other issues with the website that would need to be addressed later but contended that DSC was satisfied with the "main criteria" it

---

[7] Mr. Schultz testified that DSC stopped work with HiQo during this period because of HiQo's failure to meet its June 2017 deadline or produce a functional website in the subsequent three months. (Doc. 75, Attach. 6 at 15.)

[8] The Court notes that DSC disputes this fact to the extent it implies that HiQo allocated sufficient time or resources to the website project during this time period. (Doc. 89 at ¶ 55.

wished to have operating proficiently prior to launch. (Doc. 94, Attach. 2 at 3-4.) Ms. Bluhm alleged that DSC later discovered evidence showing HiQo developers "hard coded"[9] results into certain website features which gave DSC's website the appearance of functionality in the testing environment. (Doc. 79, Attach. 1 at 21-22.) HiQo denies that it implemented any such hard-coding, but states that, if it occurred, it would have been proper to place such code in a test system as a debugging effort. (Doc. 93 at ¶ 31.)

When the website was launched on June 4, 2018, it had significant performance issues. (Doc. 78 at ¶ 32; Doc. 93 at ¶ 32.) Many of the features included in the Swarming Proposal—such as SKU linking, improved search, and streamlined checkout—did not work correctly after the launch. (Doc. 78 at ¶ 35; Doc. 93 at ¶ 35.) For example, the website's streamlined checkout was unable to accept credit cards, a feature previously available on DSC's old website. (Doc. 78 at ¶ 36; Doc. 93 at ¶ 36.) Additionally, algorithmic features related to "Top Sellers," "Related Products," and "Customer Also Viewed" were inoperable. (Doc. 78 at ¶ 37; Doc. 93 at ¶ 37.) At some point after the website launch, DSC hired another software development provider,

---

[9] "Hard coding refers to the practice of supplying the output data of an operation manually." CSR Tech., Inc. v. Bandspeed, Inc., No. 8:11-cv-00494-MRP-MLG, 2012 WL 13018573, at *4 n.6 (C.D. Cal. Oct. 15, 2012).

Acumium, to assist with the website's performance. (Doc. 89 at ¶ 63.) Acumium made a report documenting its review of DSC's upgraded website. (Doc. 80 at 2; Doc. 80, Attach. 1.) Acumium noted several problems with the upgraded website, including that the home page required an average of 45 seconds to fully load, which Acumium classified as "VERY HIGH."[10] (Doc. 80, Attach. 1 at 6.)

Days after DSC's website launch, HiQo's only Magento certified developer, Mr. Korobuschenko, gave notice that he would be departing HiQo in late July 2018. (Doc. 78 at ¶¶ 41-42;

---

[10] In response to DSC's statement of fact about this report, HiQo objects to the Court's consideration of the Acumium report or the Swarming Proposal on the grounds that they are "inadmissible hearsay" and are not properly authenticated. (Doc. 93 at ¶ 33.) As a general rule, "[h]earsay statements, even if stated in a deposition [or declaration], cannot be considered on a motion for summary judgment." Verna v. Pub. Health Tr. of Miami-Dade Cnty., 539 F. Supp. 2d 1340, 1350 (S.D. Fla. 2008) (citing Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999)). However, courts can consider hearsay statements if they can be "reduced to admissible evidence at trial[.]" OSA Healthcare, Inc. v. Mount Vernon Fire Ins. Co., 975 F. Supp. 2d 1316, 1322 (N.D. Ga. 2013) (quoting Macuba, 193 F.3d at 1322). Further, the Court "may consider unauthenticated documents on a motion for summary judgment where it is apparent that they will be admissible at trial." The Lamar Co. v. City of Marietta, 538 F. Supp. 2d 1366, 1377 (N.D. Ga. 2008) (citations omitted). In this case, there is no indication that the information contained in the Acumium report or the Swarming Proposal is incapable of being reduced to admissible form at trial through the testimony of the preparers of each respective report. See OSA Healthcare, 972 F. Supp. 2d at 1323 (considering inventory report, in part, because there was no indication the employees responsible for updating the report would be unable to testify at trial). Accordingly, the Court will consider these documents in deciding the parties' respective motions for summary judgment.

Doc. 93 at ¶¶ 41-42.) In a June 11, 2018, email, Jeremy Udovich informed DSC of Mr. Korobuschenko's departure and that Andrey Yudenko, who was not Magento-certified, would be available to work on the open website issues 4 hours per week but that "it may take a week or so for him to understand [the system] to the point of being able to be effective." (Doc. 79, Attach. 9 at 2.) Mr. Udovich also stated that he understood if DSC felt the need to look outside of HiQo for assistance with its website. (Id.) On July 31, 2018, DSC employee Derek Purdue emailed Mr. Korobuschenko and Mr. Udovich the following: "With the failure to resolve the product import and images issues before the end of July as requested, we are terminating access and our use of HiQo." (Doc. 75, Attach. 14 at 2.)

VI.  <u>PROCEDURAL HISTORY</u>

On September 3, 2019, DSC instituted this diversity action pursuant to 28 U.S.C. § 1332 in the Western District of Wisconsin alleging one claim of breach of contract against HiQo. (Doc. 1 at ¶¶ 59-61.) Specifically, DSC alleges that HiQo breached an enforceable agreement between the parties by "failing to provide Deliverables that complied with the Specifications, failing to provide Deliverables that complied with industry standards, failing to provide Services that complied with industry standards, and failing to provide an improved and functional website." (Id. at ¶ 60.) DSC also alleges

that it suffered significant harm as a result of the breach, primarily due to the loss in online sales it purportedly experienced as a result of its website's deficiencies. (Id. at ¶¶ 54, 61.) On May 11, 2020, the District Court for the Western District of Wisconsin granted HiQo's motion to dismiss or, in the alternative, motion to transfer venue and transferred the instant action to this Court. (Doc. 34 at 7.) The parties have each filed motions for summary judgment (Docs. 75, 76), and these motions are now ripe for resolution.

### STANDARD OF REVIEW

According to Federal Rule of Civil Procedure 56(a) "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Such a motion must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial[.]' " Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56(e) advisory committee's note to 1963 amendment). Summary judgment is appropriate when the nonmoving party "fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The substantive law governing the action determines whether an element is material. DeLong Equip. Co. v. Wash. Mills Abrasive Co., 887 F.2d 1499, 1505 (11th Cir. 1989).

As the Supreme Court explained:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Celotex, 477 U.S. at 323, 106 S. Ct. at 2553 (internal quotation marks omitted). The burden then shifts to the nonmoving party to establish, by going beyond the pleadings, that there is a genuine issue concerning facts material to its case. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The Court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmoving party. Matsushita, 475 U.S. at 587-88, 106 S. Ct. at 1356. However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 586, 106 S. Ct. at 1356 (citations omitted). A mere "scintilla" of evidence or simply conclusory allegations will not suffice. See, e.g., Tidwell v. Carter Prods., 135 F.3d

1422, 1425 (11th Cir. 1998). Nevertheless, where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989) (citing Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988)).

When a court considers cross-motions for summary judgment, the standard of review "does not differ from the standard applied when one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." GEBAM, Inc. v. Inv. Realty Series I, LLC, 15 F. Supp. 3d 1311, 1315-16 (N.D. Ga. 2013) (citing Am. Bankers Ins. Grp. v. United States, 408 F.3d 1328, 1331 (11th Cir. 2005)); see also United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984) (per curiam) ("Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." (quotation omitted)).

**ANALYSIS**

I.  HIQO's MOTION TO EXCLUDE

Before the Court turns to the parties' respective motions for summary judgment, the Court must address HiQo's Motion to

Exclude or Strike Plaintiff's Liability and Damages Experts. (Doc. 82.) On August 19, 2021, HiQo moved to have the motion to exclude and its accompanying exhibits filed under seal. (Doc. 82, Attach. 1 at 5.) On December 6, 2021, the Magistrate Judge denied HiQo's motion to seal without prejudice, finding that HiQo had failed to present detailed arguments supporting the sealing of the motion to exclude and its attached exhibits. (Doc. 104 at 7, 9.) The Magistrate Judge instructed the Clerk to return HiQo's materials pursuant to Southern District of Georgia Local Rule 79.7(c) and informed HiQo that it could renew its motion to seal if it wished. (Id. at 9.)

Local Rule 79.7(c) states that

[i]f the Motion to Seal is denied, any materials which the person sought to have sealed, and which were submitted to the Clerk with the motion, shall be returned to the person who shall then have the option of filing the materials in the normal course.

S.D. Ga. L.R. 79.7(c). Under Local Rule 79.7(c), the Magistrate Judge's denial of HiQo's motion to seal should have resulted in the removal of HiQo's motion to exclude from the docket. Then, if it chose to do so, HiQo could have re-filed the motion to exclude in the normal course or filed a renewed motion to seal. HiQo, however, did neither. As it stands, the Court cannot consider HiQo's motion to exclude because it is not properly pending before the Court. Furthermore, HiQo has not consented to having its motion resolved with the knowledge that the motion's

contents and accompanying exhibits would exist on the public record. For these reasons, HiQo's motion to exclude (Doc. 82) is **DENIED AS MOOT.**[11]

## II.  PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

The Court will now focus on the primary subject of this order, the parties' respective motions for summary judgment. HiQo argues in its motion that there is no evidence in the record to support a finding that it breached any contractual agreement between the parties as set forth in the MSA. (Doc. 75, Attach. 1 at 12-19.) HiQo also argues that it is entitled to summary judgment because DSC has not established that it suffered damages directly traceable to any breach by HiQo. (Id. at 19-20.)

Conversely, DSC moves for partial summary judgment on the breach element of its claim. (Doc. 77 at 4.) DSC contends that, as a matter of law, HiQo breached the parties' "agreement by (1) failing to provide Deliverables in accordance and compliance with Specifications and (2) failing to provide Deliverables in accordance and compliance with industry standards." (Id.) Additionally, DSC asks the Court to declare as a matter of law that the MSA requires HiQo to reimburse it for its legal costs

---

[11] Ultimately, DSC concedes that its arguments in support of summary judgment are not based on its experts' opinions, so this decision likely has no practical impact on the Court's ruling on the parties' summary judgment motions. (Doc. 77 at 13 n.6.)

if HiQo is found liable for breaching the parties' agreement. (Id.)

Having described the parties' arguments in a general manner, the Court will now discuss whether either party is entitled to the relief which it seeks.

A.   Breach of Contract

Both parties agree that Georgia law governs this contract dispute under the clear terms of the MSA's Applicable Law provision. (Doc. 79, Attach. 6 at 12; Doc. 75, Attach. 1 at 12; Doc. 77 at 10 (citing Georgia contract law).)   Under Georgia law, the elements of a breach of contract claim are "(1) a valid contract; (2) material breach of its terms; and (3) damages arising therefrom." Brooks v. Branch Banking & Tr. Co., 107 F. Supp. 3d 1290, 1295 (N.D. Ga. 2015) (quoting Kabir v. Statebridge Co., No. 1:11-CV-2747-WSD, 2011 WL 4500050, at *7 (N.D. Ga. Sept. 27, 2011)). In this case, to determine whether a breach has occurred, the Court must answer two questions: first, what was the scope of the parties' agreement, i.e., what contractual duties did HiQo owe DSC; and second, did HiQo's failure to timely provide DSC with a working website breach those duties.

1. Scope of the Parties' Agreement

The parties' dispute centers on what exactly HiQo promised to provide DSC under the terms of the MSA and whether the

parties incorporated additional terms into the MSA through other communications and extraneous documents, namely the Swarming Proposal and the Project Approach Suggestion. Georgia law dictates that courts interpret contracts in three steps:

> first, the court determines whether the contract language is clear and unambiguous. If the language is clear, the court applies its plain meaning; if it is unclear, the court proceeds to step two. At step two, the court attempts to resolve the ambiguity using Georgia's canons of contract construction. If the ambiguity cannot be resolved using the canons, then the court proceeds to step three, where the parties' intent becomes a question of fact for the jury.

Tims v. LGE Cmty. Credit Union, 935 F.3d 1228, 1237 (11th Cir. 2019) (citing City of Baldwin v. Woodward & Curran, Inc., 293 Ga. 19, 30, 743 S.E.2d 381, 389 (2013)). "The cardinal rule of construction is to ascertain the intention of the parties." Id. (quoting Maiz v. Virani, 253 F.3d 641, 659 (11th Cir. 2001)). "Ambiguity exists when a contract contains an uncertain meaning, is duplicitous, and indistinct, or when a word or phrase may be fairly understood in more than one way." Snipes v. Marcene P. Powell & Assocs., Inc., 273 Ga. App. 814, 816, 616 S.E.2d 152, 155 (2005). However, the intent of the parties will become a jury question only if "the ambiguity remains after applying the applicable rules of contract construction[,]" "even though the contract may be difficult to construe." Dooley v. Dun & Bradstreet Software Servs., Inc., 225 Ga. App. 63, 64-65, 483 S.E.2d 308, 310 (1997) (citations omitted).

Here, neither party argues that the terms of the MSA are ambiguous; rather, both parties argue that the MSA unambiguously supports their proposed construction. HiQo argues that there is no provision in the MSA or any Task Order which evidences a promise by HiQo to provide a fully functioning website on a specific date. (Doc. 75, Attach. 1 at 14.) HiQo also argues that Sections 7 and 8 of the MSA unambiguously bar DSC's claims of breach. (Id. at 13.) Specifically, HiQo contends that these provisions explicitly disclaim liability for delays or software bugs and, further, that no written modification was ever signed by the parties which identified a target date or guaranteed a "bug-free website." (Id. at 13-15.) In contrast, DSC argues that HiQo's agreement to provide "Deliverables" in accordance with the MSA's "Specifications" expressly incorporated the parties' other communications regarding the website project. (Doc. 77 at 11.) DSC also argues that the MSA unambiguously required HiQo to provide Deliverables in accordance with industry standards, which it failed to do. (Id. at 13.)

Based on its review of the MSA, the Court agrees with HiQo that Section 23 of the MSA clearly limits the parties' agreement to the terms of the MSA, "any Task Order signed pursuant to [the MSA], [and] Exhibits or attachments thereto[.]" (Doc. 79, Attach. 6 at 13.) The Court also agrees, and DSC admits, that no "waiver, amendment, or modification" of Section 23 was ever made

effective "in writing and signed by both Parties."[12] (Doc. 79, Attach. 6 at 13; Doc. 90 at 15.) However, the MSA is essentially a contract setting forth terms that will govern future agreements between the parties and does not detail the nature and scope of the work to be provided under those future agreements. Pursuant to the MSA, HiQo agreed to provide "software and other development services for and on behalf of [DSC] **as more particularly described** in any Task Order or as otherwise agreed to by the Parties as evidenced or confirmed in writing." (Doc. 79, Attach. 6 at 3 (emphasis added).) HiQo also warranted any Deliverables it provided under the contract "[would] conform to the Specifications; and, [] all services provided by HiQo under and pursuant to [the MSA would] be performed and provided in a manner consistent with industry standards for the type of Services provided[.]" (Id. at 9.) The MSA defined "Deliverables" as "the documents, code, Content, Software, websites and other materials and/or products to be developed or produced by HiQo for and on behalf of [DSC] . . . under and pursuant to this Agreement[.]" (Id. at 2.) Thus, it is

---

[12] The Court notes that in some circumstances, parties' subsequent course of conduct can operate to waive a contract provision requiring that all modifications be made in writing. Hanham v. Access Mgmt. Grp. L.P., 305 Ga. 414, 417 n.2, 825 S.E.2d 217, 220 n.2 (2019) (collecting cases). However, DSC has made no argument that a course of conduct modification took place in this case, and therefore, the Court need not address this specific issue.

clear HiQo agreed that the services it provided for DSC under the MSA would conform to the Specifications and comply with industry standards.

As previously noted, the MSA provides scant details about the Specifications other than that they would be "set forth in an applicable Task Order pursuant to [the MSA]." However, DSC argues that the **"as otherwise agreed to by the Parties"** language in the MSA expressly contemplates that the details of the Specifications should be determined not only by looking at the MSA or Task Orders, but also at the parties' communications surrounding the website project. (Doc. 90 at 15-16 (emphasis in original).) Because the Task Orders are devoid of any specific details about the services HiQo agreed to provide under the MSA, DSC contends that the Court must look to the parties' communications for evidence of HiQo's contractual obligations. (Id.) DSC contends that the communication between DSC and HiQo regarding project goals and expectations was intended to be incorporated into the scope of the MSA, and to hold otherwise would be inconsistent with the language of the agreement. (Id.) On this point the Court agrees with DSC.

It is apparent that the MSA does not specifically define the services HiQo agreed to provide DSC other than to say those services would be more particularly described in a Task Order **or** otherwise agreed to by the parties as evidenced or confirmed in

writing. (Doc. 79, Attach. 6 at 3.) Thus, the MSA anticipated that the specifics of HiQo's contracted services would be outlined by two sources outside of the MSA, a Task Order or an agreement by the parties evidenced and confirmed in writing. In fact, the parties' first Task Order instructed DSC to "task HiQo by entering tasks into Jira[,]" which would be a writing outside the MSA and Task Orders. (Doc. 75, Attach. 10 at 20.) The Project T&M Model that the parties utilized stated that HiQo employees would "only work on tasks entered in Jira." (Doc. 79, Attach. 6 at 4.) Although the definition of Specifications in the MSA does not reference other writings, a finding that evidence of the parties' agreed upon services can only be found in the MSA or a Task Order would fail to "give a reasonable, lawful and effective meaning to all manifestations of intention by the parties rather than an interpretation which leaves a part of such manifestations unreasonable or of no effect." Sheridan v. Crown Cap. Corp., 251 Ga. App. 314, 316, 554 S.E.2d 296, 299 (2001) (quotation and citation omitted). The rule that contracts must be construed against the drafter, in this case HiQo, further influences the Court's decision on this issue. O.C.G.A. § 13-2-2(5). Accordingly, the Court finds that under the MSA, HiQo agreed to provide services that conformed with the Specifications, which can be determined by looking at the

parties' Task Orders or other written agreements, and that met industry standards for the type of services provided.

   2. Breach of the MSA

   A breach can take one of three forms: renunciation of liability under a contract; failure to perform the engagement; or doing something which renders performance impossible. Bd. of Regents of the Univ. Sys. Of Ga. v. Doe, 278 Ga. App. 878, 887, 630 S.E.2d 85, 93 (2006) (quoting Feagin v. Feagin, 174 Ga. App. 474, 475, 303 S.E.2d 410, 412 (1985)). DSC argues that HiQo breached the contract by failing to provide Deliverables in accordance with the Specifications or industry standards. (Doc. 77 at 13.) However, considering the disclaimers in the MSA and the parties' subsequent communications, the Court concludes that there is no evidence that HiQo breached either of these contractual duties.

   As HiQo highlights, the MSA contains specific disclaimers regarding the quality of the software it developed for DSC and potential delays in producing such software. Section 7 of the MSA, entitled "Discretion in Performing Work and Target Dates," states

> HiQo shall have the right to determine the method, details, location, time and means of performing the work agreed to hereunder. [DSC] acknowledges and agrees that delays in developing software may occur, and that although HiQo will take all reasonable steps to mitigate and minimize any such delays, HiQo shall not be penalized or held accountable for failure to

> meet such target dates unless otherwise stipulated in
> a Task Order.

(Doc. 79, Attach. 6 at 8.) The parties agree that no Task Order
was ever signed by the parties that identified an agreed-upon or
stipulated target date. (Doc. 75, Attach. 2 at ¶ 20; Doc. 89 at
¶ 20.) In relevant part, Section 8 of the MSA states that "HiQo
will perform testing and debugging of the Deliverables prior to
their delivery to [DSC] and [DSC] understands that despite
thorough testing bugs may occur." (Doc. 79, Attach. 6 at 8.) DSC
also admitted that prior to launching the upgraded website, it
knew issues with the website existed that would need to be
resolved after the launch. (Doc. 94, Attach. 2 at 3.)

In a recent decision which the Court finds instructive, the
Eleventh Circuit Court of Appeals applied Georgia law to similar
disclaimers in a software development contract. Caradigm USA LLC
v. PruittHealth, Inc., 964 F.3d 1259 (11th Cir. 2020). In
Caradigm, a healthcare provider contracted with a software
company to extract and organize patient data from the provider's
various systems into one easily accessible location. Id. at
1264-65. Shortly after executing the contract, the healthcare
provider became disappointed with the quality of the software
company's "patient-matching test." Id. at 1265. The healthcare
provider subsequently terminated its agreement, which was set to

run for five-years, and the software company sued for breach of contract. Id. at 1265-66.

The healthcare provider argued that it was entitled to abandon the contract, in part, because the software company had failed to satisfy its obligation to provide a certain level of accuracy in the patient matching. Id. at 1271. The Eleventh Circuit rejected this argument because the parties' agreement included two provisions which expressly disclaimed any level of accuracy or correctness in its patient matching. Id. The Eleventh Circuit found that these disclaimers were unambiguous and "must be afforded [their] literal meaning." Id. (citing First Data POS, Inc. v. Willis, 273 Ga. 792, 794, 546 S.E.2d 781, 784 (2001)). Further, the Eleventh Circuit found that the disclaimers were not inconsistent with a warranty in the parties' contract that required the software company to perform all services "in a professional and workmanlike manner." Id. at 1272. The Eleventh Circuit held "that the disclaimer provisions confirm that the contract did not obligate [the software company] to deliver a certain level of patient matching." Id.

Like the agreement in Caradigm, the MSA in this case included specific disclaimers which unambiguously disavow HiQo's responsibility to provide a website without flaws or to provide a website by a specific date. Even considering evidence of the parties' written communications, DSC has failed to present

30

evidence demonstrating that HiQo waived these disclaimers through any later executed agreement. DSC contends that Specifications were discussed and agreed to in HiQo's Jira system, but DSC has not provided the Court with any of these communications. (Doc. 77 at 11.) In support of its assertion, DSC cites to the deposition of HiQo's CEO Martin Mauersberg, who stated that the specifications for DSC's website project included all information conveyed by DSC in "status calls, phone calls, discovery calls," and were documented in HiQo's wiki or Jira. (Doc. 78 at ¶ 22; Doc. 79, Attach. 5 at 15.) Mr. Mauersberg does not elaborate on the specifics of these discussions other than to describe some high-level expectations DSC had for its website, and certainly does not indicate that HiQo ever agreed in writing to provide a fully functioning website by a specific date. (Doc. 79, Attach. 5 at 15-17.) Without more, the Court is unable conclude what Specifications HiQo agreed to provide and certainly cannot conclude that HiQo ever agreed to a specific target date[13] or that its software

---

[13] DSC asks the Court to follow the holding in <u>Accurate Abstracts, LLC v. Havas Edge, LLC</u>, No. 14-1994(KM) (MAH), 2018 WL 5033752, at *9 (D. N.J. Oct. 16, 2018), and find an implied reasonable time requirement for HiQo's services. (Doc. 90 at 15.) However, <u>Accurate</u> dealt with a contract that was entirely silent as to the issue of timeliness, whereas the MSA explicitly disclaims that HiQo is subject to a specific time limit, a disclaimer to which DSC agreed when it signed the MSA. <u>Id.</u> Accordingly, the Court does not find that the holding in <u>Accurate</u> is applicable to the facts of this case.

would not contain bugs. See <u>Athens Heart Ctr., P.C. v. Brasstown</u> <u>Valley Resort, Inc.</u>, 275 Ga. App. 607, 608, 621 S.E.2d 565, 566 (2005) (explaining that to be enforceable "agreement must ordinarily be expressed plainly and explicitly enough to show what the parties agreed upon" (citations omitted)). Additionally, Mr. Mauersberg's testimony that the website did not meet DSC's objectives does not establish that HiQo ever contracted to meet those objectives. (Doc. 79, Attach. 5 at 13-14.)

The Court also rejects DSC's assertion that the details of the Swarming Proposal were somehow incorporated into the terms of the parties' agreement through HiQo's Project Approach Suggestion. The Project Approach Suggestion's stated goal was simply "to describe HiQo's **proposed** approach to the Magento Migration Project." (Doc. 79, Attach. 4 at 1.) Nothing in the Project Approach Suggestion indicates that the parties agreed to be governed by its proposed project implementation plan. Notably, after setting forth a "possible project schedule," the Project Approach Suggestion contains the following warning:

> Please note that the scenario above is based on the rough estimate and on the assumption that there will be no changes in scope and priorities during the whole project duration. In real life the chances of changes in requirements that will affect tasks each team member is working [on] are very high, and so the real schedule may be different from the one presented above.

(Id. at 11.) The Court will not find that a document containing such equivocal language constitutes a binding agreement by HiQo to perform its services in a certain manner or before a certain deadline. Hartrampf v. Citizens & S. Realty Invs., 157 Ga. App. 879, 881, 278 S.E.2d 750, 752 (1981) (holding agreement that "contemplated future negotiations" concerning specific loan amount and maturity date lacked "the necessary specificity . . . and mutuality to be enforceable" (citations omitted)). Accordingly, the Court finds that HiQo never agreed to provide a fully functional website by a specific date, and in fact expressly disclaimed such an obligation. Because DSC has failed to establish that HiQo failed to perform under the terms of any enforceable agreement between the parties, the Court finds that HiQo did not breach the MSA by failing to provide Deliverables in accordance with the Specifications.

Finally, the Court finds that HiQo's warranty that its Services would meet industry standards does not negate the MSA's disclaimers. DSC contends that that it is a software industry standard that software should function properly. (Doc. 77 at 14.) The term industry standard is not defined in the MSA, but DSC contends that it is a "reasonable good-faith practice commonly accepted in the industry that software should function properly." (Id.) DSC relies on the testimony of Mr. Mauersberg that the "end result [of software development], absolutely,

should function properly to the best extent possible." (Doc. 77 at 14; Doc. 79, Attach. 5 at 8.) However, the Court finds Mr. Mauersberg's testimony is merely an acknowledgement that the ultimate goal of software development is to provide working software. Yet, as DSC admits, it was aware that it could encounter bugs with its website after launch but nevertheless made the decision to move forward.[14] (Doc. 94, Attach. 2 at 3.) DSC also decided to terminate HiQo on July 31, 2018, despite HiQo offering the services of another developer to continue work on DSC's website. (Doc. 75, Attach. 2 at ¶ 55; Doc. 89 at ¶ 55.) Therefore, even if ultimately providing working software is an industry standard, the Court cannot conclude that the "end result" of HiQo's services was below the industry standard because its services were terminated while still ongoing.

Furthermore, adopting DSC's exacting interpretation of the industry standard would render the disclaimers in the MSA

---

[14] Although DSC fails to specifically make this argument in its briefs, the Court also rejects the implication that HiQo should be found in breach based on DSC's allegation that HiQo used "hard coding" to trick it into thinking the new website was functional before the launch. DSC supports this assertion solely with the allegations of its corporate representative Ms. Bluhm and does not provide the testimony or report of the Acumium employee who supposedly discovered the hard coding. (Doc. 78 at ¶ 31; Doc. 79, Attach. 1 at 21-22.) At the summary judgment stage, these unsubstantiated allegations are insufficient to create a jury question about HiQo's liability for breach of contract. Bouey v. Orange Cnty. Serv. Unit, 673 F. App'x 952, 954 (11th Cir. 2016) (finding plaintiff's "conclusory statement . . . was not enough, absent supporting evidence, to survive the summary judgment standard" (citation omitted)).

meaningless because the disclaimers would be voided anytime HiQo's software encountered bugs or there were delays in its development. Instead, utilizing a construction that gives effect to the contract as a whole, the Court finds that HiQo could still perform in a manner that comported with industry standards while disclaiming that its software would be fully functional by a certain date. Caradigm, 964 F.3d at 1272 ("Caradigm could perform 'in a professional and workmanlike manner' and yet still disclaim a particular level of accuracy in patient matching."). Accordingly, because DSC's theory of breach is based on the timeliness and functionality of the website HiQo provided, two qualities expressly disclaimed in the MSA, the Court finds that DSC has not created a genuine issue of material fact regarding whether DSC breached its duty to provide services in accordance with industry standards.[15] As a result, because the Court finds as a matter of law that HiQo did not breach its agreement with DSC, HiQo's motion for summary judgment (Doc. 75) is **GRANTED,**

---

[15] DSC also argues that HiQo failed to meet industry standards by failing to provide Deliverables in accordance with the Specifications. (Doc. 77 at 14.) Because, as explained above, HiQo did not fail to perform services in compliance with the Specifications, the Court finds that HiQo also could not have failed to meet industry standards on this basis.

and DSC's (Doc. 76) motion for partial summary judgment is **DENIED**.[16]

CONCLUSION

Based on the foregoing, HiQo's motion for summary judgment (Doc. 75) is **GRANTED,** and DSC's motion for partial summary judgment (Doc. 76) is **DENIED**. Additionally, HiQo's motion to exclude (Doc. 82) is **DENIED AS MOOT**. The Clerk of Court is **DIRECTED** to enter judgment in accordance with this Order and to **CLOSE** this case.

SO ORDERED this **29**ᵗʰ day of August 2022.

_____
WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

[16] Accordingly, the Court does not reach the issues of damages or whether DSC would be entitled to litigation costs if HiQo was found to be in breach.